IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY DAVIS ) <br> C/O PAUL J. CRISTALLO ) <br> CRISTALLO & LaSALVIA ) <br> 614 W. SUPERIOR AVENUE ) <br> SUITE 820 ) <br> CLEVELAND, OH  44113 ) <br> ) <br>       PLAINTIFF ) <br> ) <br>   -vs- ) <br> ) <br> LAKE ERIE CORRECTIONAL ) <br> INSTITUTION ) <br> 501 THOMPSON ROAD ) <br> CONNEAUT, OH  44030 ) <br> ) <br>     -and- ) <br> ) <br> CORRECTIONS CORPORATION OF ) <br> AMERICA ) <br> 4400 EASTON COMMONS WAY, #125 ) <br> COLUMBUS, OH  43219 ) <br> ) <br>     -and- ) <br> ) <br> CORECIVIC, INC. ) <br> 4400 EASTON COMMONS WAY, #125 ) <br> COLUMBUS, OH  43219 ) <br> ) | CASE NO.: <br><br><br> JUDGE <br><br><br> **COMPLAINT** <br><br> **(JURY DEMAND ENDORSED HEREON)** |

Case: 1:17-cv-01988-DCN Doc #: 1 Filed: 09/21/17 2 of 20. PageID #: 2

|  |  |
|---|---|
| -and- | ) |
|  | ) |
| WARDEN BRINGHAM F. SLOAN | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| his individual and official capacity. | ) |
|  | ) |
| -and- | ) |
|  | ) |
| CORRECTIONS OFFICER AARON | ) |
| LAWRENCE | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| his individual and official capacity.) | ) |
|  | ) |
| -and- | ) |
|  | ) |
| CORRECTIONS OFFICER LAURIE | ) |
| TYPINSKI | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| her individual and official capacity.) | ) |
|  | ) |
| -and- | ) |
|  | ) |
| DEPUTY WARDEN OF OPERATIONS | ) |
| FISHER | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| his individual and official capacity.) | ) |
|  | ) |
| -and- | ) |
|  | ) |

2

| | |
|---|---|
| SHIFT SUPERVISOR TOTH | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| his individual and official capacity.) | ) |
| | ) |
| -and- | ) |
| | ) |
| NURSE AIKENS | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| her individual and official capacity.) | ) |
| | ) |
| | ) |
| -and- | ) |
| | ) |
| JOHN AND JANE DOES 1-10 | ) |
| C/O LAKE ERIE CORRECTIONAL | ) |
| INSTITUTION | ) |
| 501 THOMPSON ROAD | ) |
| CONNEAUT, OH  44030 | ) |
| (This individual is being sued in | ) |
| their individual and official capacity.) | ) |
| | ) |
| | ) |
| DEFENDANTS | ) |

Now comes Plaintiff, Timothy Davis, by and through counsel, and for his Complaint against the above Defendants states and avers as follows.

## INTRODUCTION

1. This is a civil rights action stemming from an incident that occurred at the Lake Erie Correctional Institution on September 21, 2016 in which a corrections officer used excessive force in violation of an inmate's Eighth Amendment rights.  The Plaintiff

inmate also seeks redress for other federal and state law claims, including but not limited to inadequate medical care, surrounding this unlawful and unjustifiable use of force.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiff's claims as Plaintiff Davis asserts claims under Title 42 U.S.C. § 1983, *et seq.* of the United States Code for violation of his right to be free from cruel and unusual punishment under the protection of the Eighth Amendment and the Fourteenth Amendment to the United States Constitution; 28 U.S.C. § 1367; Judicial Code, 28 U.S.C. §§ 1331, 1343(a) and 1391. The events in support of Plaintiff's claims, and as set forth in Plaintiff's Complaint, all took place within the jurisdiction of the United States District Court for the Northern District of Ohio such that venue is proper pursuant to 28 U.S.C.A. § 1391(b).

3. Plaintiff Davis asserts a § 1983 claim against the Defendants for failure to properly train and/or supervise their corrections officer and medical staff, and for promulgating customs, policies and/or procedures which proximately caused the violation of Plaintiff's federal Constitutional rights, all under the authority of *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).

4. Plaintiff also asserts Ohio state common law claims for assault and battery and negligent hiring, training and supervision, emotional distress and *respondeat superior*. This Court has pendent and supplemental jurisdiction over Plaintiff's state law claims.

**PARTIES**

5. At all relevant times herein, Plaintiff Timothy Davis ("Davis") was a resident of the State of Ohio and was an inmate at the Lake Erie Correctional Institution during the course of the underlying events.

6. Defendant Lake Erie Correctional Institution (hereinafter "LAECI") is a prison located in Conneaut, Ashtabula County, Ohio, and, upon information and belief, is operated by Defendant CoreCivic, a private for-profit entity, pursuant to a contract with the Ohio Department of Rehabilitation and Correction.

7. Defendant Corrections Corporation of America (hereinafter "CCA") is and/or was a private for-profit company that owned and managed Lake Erie Correctional Institution during some or all of the time of the events as described herein.

8. Defendant CoreCivic, (hereinafter "CoreCivic") a private for-profit entity, which operates pursuant to a contract with the Ohio Department of Rehabilitation and Correction.  Upon information and belief, CoreCivic owned/or and managed Lake Erie Correctional Institution during some or all of the time of the events as described herein. Upon information and belief, CoreCivic is also the re-branded version of Corrections Corporation of America and is therefore liable, in whole or in part, for Plaintiff's claims against CCA.

9. Defendant Warden Bringham F. Sloan is and was at all times relevant the Warden of LAECI and was a policy maker with decision making authority.  Defendant Sloan is sued in his official and individual capacity.  Defendant Warden Sloan is a "person" subject to being sued pursuant to 42 U.S.C. § 1983.

10. Defendant Corrections Officer Lawrence is and was at all times relevant a Corrections Officer at LAECI. Defendant Lawrence is sued in his official and individual capacity. Defendant Lawrence is a "person" subject to being sued pursuant to 42 U.S.C. § 1983.

11. Defendant Corrections Officer Typinski is and was at all times relevant a Corrections Officer at LAECI. Defendant Typinski is sued in her official and individual capacity. Defendant Typinski is a "person" subject to being sued pursuant to 42 U.S.C. § 1983.

12. This action is brought pursuant to claims arising under the laws of the State of Ohio and the Eighth and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983 as to the conduct brought under color of state law. This action is also brought pursuant to 28 U.S.C. §§ 1983, 1985 and 1988 as it is also an action for compensatory damages, punitive damages, and attorney fees.

## STATEMENT OF FACTS

### A. THE INCIDENT

13. On September 21, 2016, Plaintiff Timothy Davis was an inmate at LAECI. Davis was approximately 5'7" in height and weighed approximately 160 lbs. Davis was not serving time for a crime of violence. Indeed, prior to September 21, 2016, Davis had only been involved in one (1) minor physical incident with another inmate while at LAECI wherein there were no injuries.

14. On September 21, 2016, Corrections Officer Lawrence was over 6'0 tall and weighed between 250 lbs., to 280 lbs.

15. On September 21, 2016 at approximately 11:40 a.m., Timothy Davis was seated at a table in the cafeteria when someone at the table where he was sitting called out a disparaging comment, apparently directed at Assistant Chief of Security Carter (hereinafter "ACS Carter"). Davis did not know who made the comment, nor did he know exactly what was said.

16. ACS Carter walked over to the table and accused Davis of making the comment. Davis denied making the statement. ACS Carter then asked Davis who made the disparaging comment and Davis denied knowing who made the statement.

17. ACS Carter then takes Davis to the other side of the cafeteria. ACS Carter then tells C.O. Lawrence to take Davis to "the hole" which is parlance for isolation.

18. Davis is then handcuffed by Lawrence. There are no issues or difficulties associated with putting handcuffs Davis in handcuffs. Davis is compliant and is handcuffed behind his back without a struggle or any resistance.

19. Lawrence then takes Davis down a hallway identified as 'segregation hallway' (or 'seg hallway').

20. Surveillance video, which can be viewed by watching the following link, accurately portrays the incident and objectively supports Plaintiff's version of events:

https://www.dropbox.com/sh/qe8sw5hja5wah2s/AACXsPhCXCjUxoQ7-2aQ-8e_a?dl=0

21. Lawrence stops Davis not far from the pre-segregation medical office and has Davis face a wall on the opposite side of the door to segregation.

7

22. Around this time, Davis asks to see a Captain. Davis complains about being sent to isolation when he didn't do anything wrong. Again, Davis didn't make any disparaging comment and doesn't know who did. In response, Lawrence states: "How are you going to get a Captain to override him (meaning ACS Carter)?" Lawrence is agitated that Davis wants to talk to a Captain.

23. Shortly thereafter, Defendant Typinski comes out of the segregation door and stands directly next to Lawrence and Davis.

24. Davis again expresses the unfairness of the situation but does not use threatening or abusive language.

25. Rather, and as indisputably reflected in the LAECI hallway security video, Davis is calm, still, non-combative, non-threatening, and in all other ways compliant.

26. The surveillance video also clearly demonstrates that Davis is handcuffed behind his back and is otherwise unable to defend himself.

27. Between 00:01:00 and 00:01:05 (One minute to one minute and five seconds) as reflected in the security video, Lawrence responds to Davis by stating "Oh so you want to be a fucking hardass?" Lawrence then instructs Typinski to open the door directly to the right of Davis.

28. At 00:01:05, Lawrence pulls Davis away from the wall and then, without any legal justification, violently throws Davis up against the concrete wall. Davis immediately experiences severe pain and sustains serious injuries.

29. Defendant Typinski does not intervene so as to prevent Lawrence's unlawful assault of Davis despite the fact that she had both the opportunity and the legal

8

duty to do so. Rather, Typinski opens the segregation door so that the surveillance camera cannot capture any more of Lawrence's violent attack on Davis.

30. Typinski then positions her body and the segregation door to act as shields from the surveillance camera. Typinski, presumably a trained Corrections Officer can be seen from behind putting her left hand on her hip and faces Lawrence's continued beating of Davis. Typinski's actions of keeping the segregation door open and standing next to it were performed with the sole and unlawful purpose of shielding Lawrence's attack on Davis.

31. Lawrence had taken Davis to the ground and proceeded to bash Davis' head onto the floor. Lawrence's actions were without legal justification and caused Davis immediate and severe pain as well as serious physical injury.

32. Indeed, at approximately 00:01:22, the surveillance camera footage shows the distinct image of Davis' lower leg jutting out from behind the door. As such, while Davis is obviously on the ground and is not being calmly restrained, Typinski continues to keep her stance with her hand on her hip.

33. Typinski is not seen offering any direct security assistance to Lawrence, which objectively demonstrates that Lawrence was not in need of security assistance. Typinski's failure to assist Lawrence also evidences the fact that the over 6'0, 250 – 280lb. Lawrence did not, in fact, need security assistance against the 5'7", 160 lb., handcuffed Davis.

34. An unidentified male can be seen rushing to the scene at approximately 00:01:30 followed by approximately six other unidentified males. These individuals, presumably LAECI employees, witness the scene on the other side of the door. Typinski

remains in her position, keeping the door open and blocking the surveillance camera from Lawrence and Davis.

35. At approximately 00:04:44, a male in a white shirt with a sidearm takes a hold of the open door and continues to prop it open, at times with his foot.

36. The first view of Davis is shown at approximately 00:04:52 and illustrates he remains on the ground, although in the seated position.

37. At 00:05:27, a wheelchair is brought into the hallway and Davis is picked up and placed in the wheelchair.

38. At 00:05:40, Davis is wheeled through the open segregation door. The door, however, remains propped open by LAECI employees.

39. At approximately 00:06:06 an unidentified white female in what appears to be medical staff or orderly garb can be seen using her foot to wipe up what are presumably remnants of Davis' blood from the floor.

40. The segregation door is finally allowed to close (it does not stay open on its own and must be intentionally propped open to remain in the open position) at approximately 00:06:08. There is now a small, bright orange plastic cone behind the door.

41. At 00:06:18, an unidentified white female in medical staff or orderly garb can be seen pushing the small, bright orange plastic cone toward the area where Davis was attacked. The surveillance video also shows that two males in what appears to be either inmate garb and/or orderly/janitorial garb have walked down the hallway.

42. The LAECI staff had prevented any footage of Lawrence's assault by propping open a door and keeping it open.

43. The door was propped open until all of the blood had been wiped from Davis' head, face and body and all of Davis' blood had been wiped from the hallway floor.

### B. LAWRENCE AND TYPINSKI'S STORY TO LAW ENFORCEMENT

44. On September 22, 2016, the Ohio State Highway Patrol began an investigation into Lawrence's use of force against Davis.

45. Ohio State Highway Patrol Trooper Royko obtained written statements from C.O. Lawrence and C.O. Typinski.

46. The sworn statement from C.O. Lawrence, dated September 21, 2016, states in relevant part that "*Davis became combative, and tried to pull away from C/O Lawrence. C/O Lawrence placed Davis against the wall, and advised C/O Typinski to call for assistance. C/O Lawrence gave Inmate Davis multiple directives to stop being combative, and to calm down. Inmate Davis continued to be combative, and reached for C/O Lawrence's duty belt and groin area. C/O Lawrence took inmate Davis to the ground to gain compliance. C/O Lawrence observed inmate Davis was unconscious, and placed Inmate Davis in the recovery position till assistance arrived.*"

47. The sworn statement from C.O. Typinski, dated September 21, 2016, is inconsistent with C.O. Lawrence's statement yet, unremarkably, includes the false allegation that Davis tried to grab for C/O Lawrence's keys and/or groin area. Not only does the surveillance video disprove Lawrence's and Typinski's statement that Davis tried to grab Lawrence's keys or his groin area, the video illustrates that Typinski wasn't even looking toward Davis' hands when the alleged "grab" took place.

48. The next day, on September 22, 2017, Lawrence compounded his deceit by telling Ohio Highway Patrol Trooper Royko that he felt Davis "grab his belt where his keys are located". Lawrence's next-day version of events includes the new found allegation that Lawrence advised Davis to let go of this belt. Lawrence states that he took Davis to the ground "to gain compliance". Remarkably, and despite video evidence to the contrary, Lawrence doubled-down on the assertion that Davis grabbed his belt. Lawrence told law enforcement investigators that *"[p]rior to the take down, C/O Lawrence stated that he attempted to step away. However, **Inmate Davis continued to have a grasp of C/O Lawrence's belt.**"* (emphasis added)

49. Typinski was also interviewed by Trooper Royko on September 22, 2017 wherein she repeated her misstatements that Davis was "combative" and that Davis "tried to push away, and grabbed C/O Lawrence with his hands." Clearly, at no time was Davis combative and he did not grab Lawrence.

50. Typinski and Lawrence's false and misleading statements were not limited to the events which lead to Davis being injured. Typinski, for example, also stated that "*Inmate Davis was observed with a **small cut above his left eyebrow**, and blood in his left ear…..Inmate **Davis was heard numerous times, advising staff he was fine, and did not need to go to the hospital**.*"

51. Defendant Typinski wasn't the only LAECI employee to mislead Trooper Royko relative to the extent of Davis' injuries. Accoring to Trooper Royko's report, LAECI provided him with a photo of Davis' injuries, taken the day of the incident. Trooper Royko states that the photograph of Davis' face "show no apparent marks or bruises on his face. Only a small amount of blood is visible from his left ear."

52. In fact, and contrary to Typinski and the LAECI photograph, Inmate Davis was not fine. Rather, Davis had to be transported via life-flight to University Hospitals where he underwent potentially life-saving surgery for a brain bleed. Lawrence had smashed Davis' head onto the wall and/or floor with such force that he fractured Davis' skull. The University Hospital emergency medical records indicate as follows:

> *Acute left parietal temporal epidural hemorrhage, with acute right-sided subdural hemorrhage over the entire right cerebral convexity (as described below). There is also a nondisplaced acute fracture involving the left temporal bone underlying the acute left-sided epidural hemorrhage, with fracture line extension into the skull base. There is a 5mm leftward midline shift, and effaced appearing left lateral ventricle.*

53. Davis underwent emergency brain surgery, a decompressive craniectomy. A craniectomy is a neurosurgical procedure in which part of the skull is removed to allow a swelling brain room to expand without being squeezed. It is performed on victims of traumatic brain injury.

54. Upon interviewing Davis in person, Trooper Royko agreed that Davis' face did not appear to have sustained lacerations or bruising, but noted "numerous stitches (more than 15) on the left side of his head." Unfortunately, and based on what he was told by Typinski, Lawrence and others at LAECI, Trooper Royko was looking for a "small laceration above Davis' left eyebrow". As such, the significance of the stitches was completely lost on him. Trooper Royko apparent disregard for the multiple stitches along the left-side of Davis' skull is evidenced in his report, which states in part, "It should be noted, the stitches were made because of a medical procedure Inmate Davis underwent at the hospital." No one from LAECI so much as mentions life-saving brain surgery, an emergency life-flight, or brain decompression to Trooper Royko.

### C. LAECI/CCA/CORECIVIC/WARDEN SLOAN JUSTIFY LAWRENCE'S ASSAULT

55. Despite video evidence disproving C/O Lawrence and C/O Typinski's versions of Davis' conduct, and despite the video evidence disproving C/O Lawrence's explanation of the force he employed, and despite the blatant and intentional minimization of Davis' life-threatening injuries, and despite Typinski's and other LAECI employee's inexcusable blocking of a surveillance camera so as to prevent footage of Lawrence's relentless assault, the Use of Force Committee ruled that Lawrence's use of force was justified.

56. The individuals responsible for insuring that Lawrence and Typinski would not be held accountable for their misdeeds include Warden Sloan – who, as a policy maker has permitted, facilitated, encouraged, and participated in customs, policies, practices meant to deprive individuals of their Constitutional rights. Davis' injuries were a direct and proximate result of such customs, policies and practices. Warden Sloan has also failed to discipline and/or otherwise take corrective action in the face of corrections officers employing excessive force such that he has ratified the unlawful behavior. Warden Sloan's ratification of this conduct has also rendered the occurrence of such incidents entirely foreseeable. The Deputy Warden of Operations, Deputy Fisher, is also responsible as a policy-maker and shares liability on the same basis as Warden Sloan.

57. Warden Sloan, Deputy Warden Fisher, and Shift Supervisor Toth are also responsible for Davis' injuries as they all reviewed the evidence and were made aware of Lawrence's unlawful behavior as well as Typinski's role in obscuring Lawrence's attack of Davis and his resulting injuries. Despite the overwhelming evidence that Davis had

almost been killed by C/O Lawrence and was victimized while in handcuffs, these Defendants endorsed, ratified, justified, and/or condoned the unlawful and unconstitutional actions of Lawrence and Typinski. Davis' injuries and losses were a direct and proximate result of their misdeeds and inactions.

58. LAECI Nurse Aikens is also responsible for Davis' injuries and losses in that she, along with other LAECI medical staff, failed to provide adequate medical care to an objectively serious medical need, and as a result caused Davis damage and further injury. Nurse Aikens report that Davis' injuries consisted of a" small cut above his left eyebrow" and some blood in his ear, despite the fact that Davis had been knocked unconscious by a violent blow to his skull that required emergency brain surgery, is objectively unreasonable and misleading, and further, evidences the degree to which Davis' serious medical need was not adequately addressed.

59. As a direct and proximate result of the actions and inactions of the Defendants, Plaintiff suffered severe and permanent injuries. Further, and as a direct and proximate result of the actions and inactions of the Defendants, Plaintiff continues to endure physical and emotional pain and suffering. Plaintiff Davis seeks compensatory damages, punitive damages, and reasonable attorneys' fees and costs incurred in this action.

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 Claim Against Defendant Lawrence for Excessive Force in Violation of the Eighth and Fourteenth Amendment

60. At the aforementioned time and place, Defendant Lawrence was acting under color of law and within the course and scope of his employment as a corrections officer and used unnecessary, unreasonable, outrageous, and excessive force on Davis in

violation of Davis right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment. Lawrence's conduct was also in violation of Davis' Fourteenth Amendment rights as set forth herein.

61. Defendant Lawrence's use of unnecessary, unreasonable, outrageous, and excessive force, as described herein, constitutes wanton, willful, reckless, unjustifiable, and malicious conduct warranting the imposition of exemplary punitive damages.

62. As a direct and proximate result of Defendant Lawrence's use of force in violation of Davis' Eighth and Fourteenth Amendment rights, Davis sustained damages, including, but not limited to, severe and permanent physical injury, physical and emotional pain and suffering, all of which will continue into the future.

## SECOND CAUSE OF ACTION
### Assault and Battery

63. Lawrence's actions, as described herein, constitute assault and battery, as well as willful, wanton, intentional, and reckless conduct under the law of the State of Ohio.

64. As a direct and proximate result of Defendant Lawrence's assault and battery, Davis sustained physical injuries, emotional distress and other damages and losses.

## THIRD CAUSE OF ACTION
### Infliction of Emotional Distress

65. Through their unreasonable and unlawful conduct, Defendant Lawrence and Defendant Typinski either intended to cause Davis emotional distress or knew or should have known that their actions or inactions would result in serious emotional

distress. Further, Lawrence and Typinski's actions toward Davis were so extreme and outrageous as to go beyond all possible bounds of decency and were intolerable.

66. Defendants Lawrence and Typinski's actions directly and proximately caused Plaintiff Davis psychic injury from which he suffers and will continue to suffer into the future.

## FOURTH CAUSE OF ACTION
### Negligent Hiring, Training, Retention and Supervision

67. Defendants CCA, Corecivic, and/or Lake Erie Correctional Institution were negligent relative to hiring, training, retaining and supervising of their employees including but not limited to Lawrence, Typinski, Sloan, Fisher, Toth and Aikens. These employer Defendants' negligence in this regard directly and proximately led to Plaintiff Davis' injuries and damages

## FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 Against Defendants LAECI, CCA, CoreCivic, Sloan, Fisher, and Toth pursuant to *Monell*

68. These Defendants have, under color of state law, deprived Plaintiff Davis of rights, privileges and immunities secured by the Eighth and Fourteenth Amendment to the U.S. Constitution.

69. As set forth herein, some or all of these Defendants have a pattern and practice of failing to adequately investigate uses of lethal and non-lethal force; of improper training and supervision such that violations of the Constitution occur and are

foreseeable; and have customs, policies and practices which result in the violation of Constitutional rights

70. Other Defendant policymakers ratified unconstitutional conduct and were on notice of the obvious need to train and supervise their employees relating to excessive force, yet they failed to adequately train and supervise the individual officers in that regard.

71. As a direct and proximate result of these failures by the Defendants, Plaintiff Davis sustained injury, a loss of his rights, and other damages.

## SIXTH CAUSE OF ACTION
## Deliberate Indifference to a Serious Medical Need

72. The acts and omissions of Defendant Nurse Aikens and John Doe Medical Providers constitute a deliberate indifference to a serious medical need such that Davis' rights as protected under the Eighth and Fourteenth Amendments of the United States Constitution were violated

73. As a direct and proximate result of these failures by the Defendants, Plaintiff Davis sustained injury, a loss of his rights, and other damages.

## SEVENTH CAUSE OF ACTION
## Typinski: Failure to Intervene

74. Defendant C/O Typinski had the duty and opportunity to intervene so as to prevent or minimize the assault and Constitutional violations inflicted upon Davis by Defendant Lawrence but she failed to do so.

75. Defendant Typinski's failure, as well as her deliberate actions to obscure and cover-up Lawrence's unlawful actions, proximately caused Plaintiff Davis physical,

emotional, and psychic injury from which he suffers and will continue to suffer into the future.

## DAMAGES

76. As a direct and proximate result of the Defendants' conduct, Plaintiff Davis suffered a loss of his Constitutional rights, physical injury, pain, mental anguish and emotional distress, as well as economic and non-economic losses, some or all of which are be permanent.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment against the Defendants, jointly and severally, for:

(A) Compensatory and consequential damages for all the injuries identified in the amount in excess of Twenty Five Thousand Dollars ($25,000.00);

(B) Punitive damages against Defendants Lawrence and Typinski in an amount to be determined at trial for the malicious conduct of these Defendants;

(C) Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

(D) All other relief that this Court deems equitable, necessary, and just.

                                                       */s/Paul J. Cristallo*_____

                                                       PAUL J. CRISTALLO (0061820)
                                                       Cristallo and LaSalvia, LLC.
                                                       614 West Superior Avenue, Suite 820
                                                       Cleveland, OH 44113
                                                       Telephone: (216) 400-6290
                                                       Facsimile: (216) 727-0160
                                                       E-Mail: paul@makeitrightohio.com

                                                       COUNSEL FOR PLAINTIFF TIMOTHY DAVIS

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

                                          __*Paul J. Cristallo*_____
                                          PAUL J. CRISTALLO
                                          Attorney for Plaintiff Davis

Case: 1:17-cv-01988-DCN Doc #: 1 Filed: 09/21/17 20 of 20. PageID #: 20